Central Park Sightseeing LLC v New Yorkers for Clean, Livable & Safe Sts., Inc. (2017 NY Slip Op 08619)





Central Park Sightseeing LLC v New Yorkers for Clean, Livable & Safe Sts., Inc.


2017 NY Slip Op 08619


Decided on December 7, 2017


Appellate Division, First Department


Manzanet-Daniels, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 7, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Peter Tom, J.P.
Dianne T. Renwick
Sallie Manzanet-Daniels
Barbara R. Kapnick, JJ.


656416/16 4281 

[*1]Central Park Sightseeing LLC, Plaintiff-Respondent,
v
New Yorkers for Clean, Livable & Safe Streets, Inc. doing business as NYCLASS, et al., Defendants-Appellants, Edward A. Sullivan, et al., Defendants.



Defendants New Yorkers for Clean, Livable & Safe Streets, Inc., Jill Carnegie, Edita Birnkrant, Stacy Monterosa and Michael Dolling appeal from the order of the Supreme Court, New York County (Arthur F. Engoron, J.), entered February 22, 2017, which granted plaintiff's motion for a preliminary injunction to the extent of enjoining and restraining defendants "and/or anyone else who becomes aware of this Decision and Order" from (1) "physically blocking, impeding, or obstructing any persons from seeking or taking, or providing ... a lawful horse-carriage ride disembarking from Central Park South"; (2) "physically touching, pushing, shoving, or grabbing any



such persons or horses"; (3) "yelling or shouting at, or aggressively accosting, any such persons, or any carriage horses, from a distance of less than nine feet"; (4) "physically blocking, impeding, or obstructing the progress of any such horse-carriage ride"; (5) "handing literature to persons situated within a horse carriage"; and (6) "counseling, facilitating, aiding, or abetting any other person from doing such things [sic]."
Gibson, Dunn & Crutcher LLP, New York (Randy M. Mastro, Caitlin Halligan, Akiva Shapiro, Gabriel K. Gillett, William J. Moccia and Timothy Sun of counsel), and Cahill Gordon & Reindel LLP, New York (Joel Kurtzberg and Peter J. Linken of [*2]counsel), for appellants.
Einbinder Dunn & Goniea LLP, New York (James A. Goniea and Michael Einbinder of counsel), for respondent.



MANZANET-DANIELS, J.


In this case, we are asked to balance the First Amendment rights of animal rights protestors against the government's interest in maintaining public safety and the safe flow of traffic on its public streets and byways. The government's significant interest warrants upholding the challenged injunction insofar as it prohibits protestors from blocking, impeding, or obstructing the passage of horse carriages throughout the park roads and onto the City streets (sometimes aggressively, spooking the horses), and from blocking, impeding, or obstructing customers from seeking, taking or disembarking from horse carriages. We similarly uphold the prohibition on leafletting of any passenger in a horse carriage, as valid in furtherance of public safety. However, a blanket prohibition on leafletting and a so-called "floating buffer zone" are not permissible under First Amendment jurisprudence. Accordingly, we modify the injunction to establish a nine-foot buffer zone at the loading/unloading areas, and to prohibit any person from knowingly approaching another person in the loading/unloading areas without consent for the purpose of handing a leaflet or bill or displaying a sign or engaging in oral protest or education of the other person. This modification strikes the appropriate balance between the First Amendment rights of the
protestors and the rights of customers and other pedestrians to avoid unwelcome approaches.
Plaintiff (CPS) is a business that, inter alia, offers residents and tourists horse-drawn carriage rides in Central Park. Sixty-eight horse-drawn carriages operate in Central Park. CPS owns eight of them and is affiliated with 32 independent carriage owners and operators. CPS books carriage rides both for independent owners/operators affiliated with CPS and for the horse-drawn carriages in which CPS has an ownership interest. Customers may purchase tickets online in advance, at a nearby store location, or from the drivers.
Defendant New Yorkers for Clean, Livable & Safe Streets, Inc. d/b/a NYCLASS is an animal rights organization that protests against the horse-and-carriage industry, among other things. The individually named defendants have participated in animal rights demonstrations in the zones where carriage operators and drivers pick up and drop off customers. The individual defendants are estimated to have engaged in such protest activity between 10 and 40 times over a five-month period.
The horse-drawn carriages line up at the curb on the north side of Central Park South at four designated horse-drawn carriage zones, including Columbus Circle and Fifth Avenue's Grand Army Plaza. The drivers line up next to the curb at each
of the locations with the line typically extending along the street in a southeast direction. When customers or potential customers approach the line of carriages, they are generally directed to the first available horse-drawn carriage at the front of the line.
Defendants' protest activities are targeted generally to the public, and specifically to CPS's drivers and CPS's customers and potential customers. Plaintiff maintains that defendants "harass[]," "threaten[] and intimidat[]" and assault customers and drivers, as well as physically block horse-drawn carriage paths and create a safety danger by running after the carriages in traffic and spooking the horses. Defendants maintain that their protest activities are protected by the First Amendment.
Plaintiff commenced this action alleging public nuisance, tortious interference with contractual relations, and tortious interference with prospective economic advantage, and contemporaneously moved for the entry of a preliminary injunction, relying on, inter alia, video evidence of defendant's protest activities. The videos showed, inter alia, protesters harassing, yelling obscenities at, and threatening and intimidating drivers, customers, and potential [*3]customers, including those with young children; obstructing customers and potential customers from boarding horse carriages; blocking the
passage of horse carriages; and engaging in loud and aggressive behavior in close proximity to the horses, spooking them and endangering public safety.
The court granted plaintiff's motion for a preliminary injunction to the extent of enjoining and restraining defendants "and/or anyone else who becomes aware of this Decision and Order" from
"1. physically blocking, impeding, or obstructing any persons from seeking or taking, or providing ... a lawful horse-carriage ride disembarking from Central Park South ...;
"2. physically touching, pushing, shoving, or grabbing any such persons or horses;
"3. yelling or shouting at, or aggressively accosting, any such persons, or any carriage horses, from a distance of less than nine feet (... three yards...);
"4. physically blocking, impeding, or obstructing the progress of any such horse-carriage ride;
"5. handing literature to persons situated within a horse carriage; and
"6. counseling, facilitating, aiding, or abetting any other person from doing such things."
The court made it clear that "[b]oth sides agree that defendants can protest, including picket, hold signs, hand out literature, bear witness, and raise their voices," noting that "the content of the speech is not at issue here; the manner of delivery is."
Plaintiff established a likelihood of success on its cause of action for a public nuisance. The evidence, which includes videos, demonstrates that the protestors blocked paths and chased after moving horse-drawn carriages and that their loud and aggressive behavior frightened the horses, making them nervous and more likely to start, and creating a hazard to all involved; this evidence satisfies the public harm element of the cause of action (see People v Rubenfeld, 254 NY 245 [1930]; New York ex rel. Spitzer v Cain, 418 F Supp 2d 457, 483-484 [SD NY 2006]). There is also ample evidence that plaintiff has sustained a "special injury" beyond that suffered by the community at large (compare 532 Madison Ave. Gourmet Foods v Finlandia Ctr., 96 NY2d 280, 292 [2001]). Indeed, defendants have targeted plaintiff's business, encouraging seated passengers to leave their horse-drawn carriages and either not pay for their rides or ask for their money back, and telling one driver, "You might as well go back to the stables now. You're not going to do any business."
Plaintiff established a likelihood of success on the merits of its cause of action for tortious interference with contractual relations (see Hannex Corp. v GMI, Inc., 140 F3d 194, 206 [2d Cir 1998]). The fact that a portion of plaintiff's horse-drawn carriage business is pre-purchased online and passengers approach carriages with vouchers in hand demonstrates both the existence
of valid contracts and defendants' awareness of the contracts. As for passengers who book rides directly with carriage drivers, they surely have entered into contracts for services by the time their carriages have begun to move.
While, as defendants argue, the cancellation of pre-purchased tickets pursuant to the terms of the contract cannot support a cause of action for tortious interference with a contract (see Jack L. Inselman & Co. v FNB Fin. Co., 51 AD2d 924, 925 [1st Dept 1976], affd 41 NY2d 1078 [1977]), plaintiff's claims are not based solely on those contracts.
The tortious nature of defendants' conduct is demonstrated by, inter alia, their yelling at drivers and customers and potential customers while standing near horses, blocking access to carriages, and physically touching people — actions that appear on defendant Jill Carnegie's own [*4]list of "DON'T's" for her fellow protestors. Defendants' reliance on McGill v Parker (179 AD2d 98 [1st Dept 1992]) is misplaced. Plaintiff's allegations of tortious interference are specific, and the content of defendants' written material and speech are not at issue.
Plaintiff established irreparable harm by showing defendants' interference with its "right to carry on a lawful business without obstruction" (see David Harp Rest. Mgt. v Cromwell, 183 AD2d 423, 423 [1st Dept 1992]) and the danger that
defendants' conduct poses to public safety and order (see Schenck v Pro-Choice Network of W. N.Y., 519 US 357, 376 [1997]; People v Anderson, 137 AD2d 259, 271 [4th Dept 1988]).[FN1]
The balance of the equities weighs in plaintiff's favor. Absent injunctive relief, plaintiff's business would continue to be harmed, and its drivers, customers, and potential customers, and members of the public would continue to be subjected to harassing and potentially dangerous conduct. Defendants will sustain no irreparable harm, since the injunction neither prevents them from exercising their First Amendment right to protest what they perceive to be a form of animal cruelty nor affects their message (compare Elrod v Burns, 427 US 347, 373 [1976]).
The injunction is content-neutral, and therefore we must ask "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest" (Madsen v Women's Health Ctr., Inc., 512 US 753, 765 [1994]), here, the government's interest in public safety and
order.
A "floating buffer zone" would, as defendant points out, make it "quite difficult for a protestor who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction" and presents a "substantial risk" that much more speech will be burdened than necessary to protect public safety and order (Schenk, 519 US at 378). We accordingly modify paragraph 3 of the injunction to prohibit any person from knowingly approaching within nine feet of another person in the loading/unloading zone, without that person's consent, for the purpose of handing a leaflet or bill or displaying a sign or engaging in oral protest or education of such other person (see Hill v Colorado, 530 US 703 [2000]).[FN2]
Public sidewalks, streets, and ways are the "quintessential" public fora for free speech, and leafletting, signs, and displays are time-honored methods of communication enjoying First Amendment protection (id. at 715 [internal quotation marks omitted]). Nonetheless, the Supreme Court has consistently recognized "the interests of unwilling listeners in situations
where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure" (id. at 718 [internal quotation marks omitted]). We believe the instant injunction, as modified, respects the First Amendment rights of defendant protestors while recognizing the rights of carriage passengers to be free of unwanted intrusions.
The nine-foot zone represents a "conversational distance," allowing normal communication (id. at 726-727). The prohibition on "oral education and protest" ensures that casual conversation is not within the ambit of the injunction (id. at 721-722). Notably, the "knowingly approaches" requirement would allow a protestor to stand still while a passenger walks or rides past without running afoul of the injunction (id. at 713 [internal quotation marks omitted]). A leafletter might stand in the path of pedestrians and proffer his or her literature, which the pedestrian can choose to accept or decline (id. at 727). Finally, it is to be noted that those standing in place with signs would remain unaffected by the injunction (id.).
We draw a distinction between protestors in the loading and unloading zones, and those who follow the horses along the carriage roads and onto the surrounding streets. The First Amendment does not require that protestors be permitted to disrupt traffic, spook horses, and endanger public safety in
order to convey their message. Courts have recognized a distinction between leafletting on public sidewalks and handing leaflets to the occupants of moving vehicles; the latter may be prohibited due to valid safety concerns posed by handing literature to persons on public roadways (see e.g. Contributor v City of Brentwood, Tenn., 726 F3d 861 [6th Cir 2013] [upholding portion of city ordinance that prohibited sale or distribution of literature to the occupant of any motor vehicle on a street in order to further "the goals of traffic safety and flow"]; Gonzalez v City of New York, ____ F Supp 3d ___, 2016 WL 5477774, 2016 US Dist LEXIS 134474 [SD NY Sept. 29, 2016] [rejecting First Amendment challenge to arrest for disorderly conduct for obstructing traffic]; Cosac Found., Inc. v City of Pembroke Pines, 2013 WL 5345817, 2013 US Dist LEXIS 135647 [SD Fla. Sept. 21, 2013] [upholding ordinance prohibiting solicitation or canvassing on roadways as exercise of significant government interest in regulating traffic flow and preventing injury to pedestrians and motorists]). Defendants have ample alternative channels of communication open to them through protest and leafletting in the pick-up/drop-off zones and on the surrounding public sidewalks (see Contributor, 726 F3d at 865-866).
As the United States Supreme Court has recognized, "When clear and present danger of . . . interference with traffic upon
the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious" (Cantwell v State of Connecticut, 310 US 296, 308). The government has "a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of its citizens" (Madsen, 512 US at 768).
Finally, the injunction is overbroad inasmuch as it purports to limit the free speech not only of defendants, but also of "anyone else who becomes aware of this [d]ecision and [o]rder." We accordingly modify to make it applicable to defendants and "those acting in concert with the named parties" (Madsen, 512 US at 775-776 [internal quotation marks omitted]).
Accordingly, the order of the Supreme Court, New York County (Arthur F. Engoron, J.), entered February 22, 2017, which granted plaintiff's motion for a preliminary injunction to the extent of enjoining and restraining defendants "and/or anyone else who becomes aware of this Decision and Order" from (1) "physically blocking, impeding, or obstructing any persons from seeking or taking, or providing ... a lawful horse-carriage ride disembarking from Central Park South"; (2) "physically touching, pushing, shoving, or grabbing any such persons or horses"; (3) "yelling or shouting at, or aggressively accosting, any such
persons, or any carriage horses, from a distance of less than nine feet"; (4) "physically blocking, impeding, or obstructing the progress of any such horse-carriage ride"; (5) "handing literature to persons situated within a horse carriage"; and (6) "counseling, facilitating, aiding, or abetting any other person from doing such things [sic]," should be modified, on the law and the facts, to limit the applicability of the injunction to the named defendants and those acting in concert with the named defendants; to modify subsection (3) to prohibit defendants from knowingly approaching within nine feet of another person in the loading/unloading areas without that person's consent; [*5]to clarify that subsection (6) shall not apply to legal advice; and otherwise affirmed, without costs.
All concur.
Order, Supreme Court, New York County (Arthur F. Engoron, J.), entered February 22, 2017, modified, on the law and the facts, to limit the applicability of the injunction to the named defendants and those acting in concert with the named defendants; to modify subsection (3) to prohibit defendants from knowingly approaching within nine feet of another person in the loading/unloading areas without that person's consent; to clarify that subsection (6) shall not apply to legal advice; and otherwise affirmed, without costs.
Opinion by Manzanet-Daniels, J. All concur.
Tom, J.P., Renwick, Manzanet-Daniels, Kapnick, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 7, 2017
CLERK



Footnotes

Footnote 1:Plaintiff's lost profits are arguably calculable, by extrapolation from its estimate of the average number of daily walk-up passengers' rides for each horse-drawn carriage (see e.g. Wolf St. Supermarkets v McPartland, 108 AD2d 25, 33 [4th Dept 1985], lv dismissed 68 NY2d 833 [1986]). They accordingly are compensable by money damages and cannot serve as the basis for a finding of irreparable harm (GFI Sec., LLC v Tradition Asiel Sec., Inc., 61 AD3d 586 [1st Dept 2009]).

Footnote 2:In Hill, the Supreme Court upheld a Colorado statute providing substantially the same regulation of speech-related content as constitutional. While this case involves review of an injunction, not a statute, we believe that Hill is nonetheless instructive.